STONE & DOWNER CO. (DENNISON MANUFACTURING CO.) *v.* UNITED STATES (No. 3611)[1]

---

[1] T. D. 46958.

480

United States Court of Customs and Patent Appeals, February 12, 1934

*Brooks & Brooks* (*Frederick W. Brooks, Jr.*, of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*Thomas J. Canty*, special attorney, of counsel), for the United States.

[Oral argument October 10, 1933, by Mr. Brooks, Jr., and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, in Reappraisements 100491–A, 100518–A, 100519–A, 100520–A, 100521–A, 100522–A, and 100788–A.

The merchandise, consisting of greeting cards and calendars, imported under the Tariff Act of 1930, was entered at the port of Boston. In Reappraisement 100788–A, it was appraised by the appraiser at values higher than the entered values, and the importers appealed to reappraisement; whereas, in the other reappraisements, it was appraised at its entered values, and the collector appealed.

It is conceded by counsel for the parties that the merchandise has no export values.

The sole issue in the case is whether foreign values have been established, and, if so, whether they are the prices paid by certain wholesalers, and one large retailer operating chain stores, or whether they are the prices paid by the other customers of the manufacturer—1,196 retailers.

On the trial before the trial court, Brown, Judge, presiding, the Government introduced in evidence Exhibit I, a report by a special agent of the Government.

It appears from the special agent's report that he visited the office of the manufacturer, E. W. Savory, Ltd., Bristol, England, and made a personal inspection of the books of that concern, and also had some conversation with either Mr. E. W. Savory, chairman of the board of directors, or Mr. Mortimer Savory, joint managing director of that firm, he did not state which, relative to the issues here involved; that the importer, Dennison Manufacturing Co., Framingham, Mass., is the exclusive agent in the United States for the "standard line of cards and calendars sold by the manufacturer", although a "special line of high quality cards" has been produced and sold, exclusively, for several years to Cartier, Inc., of New York City; that merchandise identical in character to that here involved was sold in the country

of exportation at fixed prices, "less varying discounts, depending upon the status of the customer"; that the manufacturer did not issue printed price lists; that orders for the cards and calendars were taken by salesmen representing the manufacturer; that a "separate series of numbers is assigned each group of cards selling at the same price and these numbers denote to the traveler [the manufacturer's salesmen] the selling price"; that the "first number of a series indicates the year in which the designs were offered"; and that he had been told by "Mr. Savory" that no alteration would be made in the prices which had remained the same for several years. The witness then stated:

There is reproduced below a *complete list of all series of standard lines of cards and calendars* sold both in the home market and to Dennison, together with the manufacturer's home-market price per gross or per dozen.

\* \* \* \* \* \* \*

### CARDS

| Series no. | Home-market price |
|---|---|
| | *Per gross* |
| 11– 180 | 8/– |
| 1101– 1175 | 16/– |
| 1201– 1260 | 24/– |
| 1301– 1330 | 32/– |
| 1441– 1490 | 48/– |
| 1601– 1617 | 72/– |
| 18001–18022 | 96/– |
| | *Per dozen* |
| 11001–11008 | 12/– |
| 11051–11052 | 16/– |
| 11125–11127 | 20/– |
| 11151–11153 | 24/– |

### CALENDARS

| Series no. | Foreign value | Export value | Calendars only | Envelopes only |
|---|---|---|---|---|
| | *Per gross* | *Per dozen* | | |
| 91519, etc | 48/– | 4/– | 3/5 | 7d. |
| 92560, etc | 72/– | 6/– | 5/2 | 10d. |
| 93504, etc | 96/– | 8/– | 6/10 | 1/2d. |
| 93701, etc | 120/– | 10/– | 8/6 | 1/6d. |
| 94537, etc | 144/– | 12/– | 10/3 | 1/9d. |
| 95509, per dz | 16/– | 16/– | 13/8 | 2/4d. |
| 96501, per dz | 20/– | 20/– | 17/– | 3/– |
| 96701, per dz | 24/– | 24/– | 20/6 | 3/6d. |
| 97501, per dz | 28/– | 28/– | 23/9 | 4/3d. |
| 97601, per dz | 32/– | 32/– | 27/3 | 4/9d. |
| 98501, per dz | 40/– | 40/– | 34/– | 6/– |
| 99501, per dz | 60/– | 60/– | 51/– | 9/– |

*Status of customers:*

The manufacturer does not encourage a wholesale business as they maintain a staff of salesmen who call upon the retail trade to solicit orders.

There are approximately 1,200 customers in the home market who purchase cards and calendars and all are retailers except four. Three of these four customers are wholesalers and one a retail firm operating chain stores to *whom preferential treatment is given in the matter of discounts because of the large volume of annual business.*

The *wholesalers* are granted *higher discounts because of their status* as such "*irrespective of* the *quantities purchased.*"

*Discounts:*

It is customary in the home trade to solicit orders in May or June, deliveries to be made in the autumn, settlement to be made in January.

\*     \*     \*     \*     \*     \*     \*

Discounts to retailers and wholesalers are as follows·

### CARDS AND CALENDARS

*Retailers:*

10% for settlement January.   2½% cash, only if paid within 14 days from date of invoice.

### CARDS AND CALENDARS

*W. Ritchie & Sons, Ltd. (wholesalers):*

25%, 5%, and 2½% for settlement in January.   Extra 2½% if paid within 14 days from date of invoice.

For the year 1931, an extra 5% for all business in excess of £350, which is the total amount of business for the year 1930.

### CARDS

*W. H. Smith & Sons, Ltd. (wholesalers):*

25% & 10% settlement January.

### CALENDARS

25% & 2½% settlement January.   Extra 2½ % if paid within 30 days from date of invoice.

### CARDS AND CALENDARS

*Dennison Mnfg. Co., London (wholesalers):*

33⅓% trade.   2½% cash only if paid within 7–10 days from date of invoice.

### CARDS AND CALENDARS

*Boots Pure Drug Co. (chain stores):*

1930—25% & 2½% settlement January.

1931—Cards—For total order of £1,500 nett, an extra 2½%.   If not less than £2,000 nett, 5% extra.

*Calendars.*—For total order of £500 nett, an extra 5%.   This order has been placed.   If not less than £1,000 nett, 10% extra.

*Proportion of business at various discounts:*

Mr. Savory refused to permit me to make an analysis of sales to determine the proportion of the total annual business done at each trade discount, for the reason he stated, that he could not divulge to anyone, not a member of the firm, this highly confidential information.   He did state, however, that by far the greater proportion of the total annual business is done with retailers.   This is apparent, since there are approximately 1,200 retailers who purchase cards and calendars, to only four (4) firms who are treated as wholesalers.

\*     \*     \*     \*     \*     \*     \*

*Usual wholesale quantity:*

### CALENDARS

*Retailers purchase from ½ doz. to 3 doz. each number,* a total of from 5 dozen to 42 dozen in a yearly order.

The average is approximately 8–10 dozens.

Wholesalers purchase in quantities of 6, 12, and 24 dozens each number. Last year (1930) W. H. Smith & Sons purchased 90 dozen.

*Retailers purchase from ½ doz. to 1 dozen of a number* and a total of from 5 to 50 dozen.

Wholesalers purchase in quantities of 12, 24, & 36 dozen of one number. In 1930, Boots Drug Co. purchased 57 gross. (Italics in body of quote ours.)

The importers introduced in evidence Exhibit II, an affidavit of Mr. Ernest Wyman Savory, wherein the witness stated that he was at that time, and had been for 32 years, a director and chairman of E. W. Savory, Ltd., of Bristol, England; that he was intimately acquainted with the affairs of his company; and that, due to the fact that he had personal contact with the trade during that period of time, he had—

personal knowledge of the customs of the trade in the British Isles dealing in Christmas greeting cards and calendars (hereinafter referred to as "the said goods") such as supplied by the company to the Dennison Manufacturing Company, of Framingham, Massachusetts, U.S.A., and to retailers and whole-salers in the British Isles.

During the year 1931 practically all of our sales to our wholesale customers (Boots Pure Drug Co., W. Ritchie & Sons Limited, W. H. Smith & Son Limited, and Dennison Manufacturing Company) have been in the usual wholesale quantities in the ordinary course of trade in the said goods in the British Isles viz, one gross each or more for the cheap items and one half gross each or more for the expensive items except for a few sales made as an accommodation to these customers, of say a dozen or so of an item, and the average value of ship-ments to these customers has been approximately four hundred and ten pounds sterling and the average quantity has been approximately three hundred and ten gross, whereas, on the other hand, all of our sales to the retailers have been in less than the usual wholesale quantities hereinbefore stated, and shipments have ranged in value from five shillings upwards.

On this record the trial court held that the usual wholesale quan-tities in which the involved merchandise was sold in the "British Isles" were the "quantities purchased by the wholesalers and not the smaller quantities purchased by the retailers", and that the entered values represented the foreign values of the merchandise. Judgment was entered accordingly.

The Appellate Division of the Customs Court, on the Government's application for a review of the judgment of the trial court, in an opin-ion by Cline, Judge, held that the foreign values of the merchandise were the prices paid by the "retailers", that is, the basic prices set forth in the report of the special agent, less discounts of 10 per centum and 2½ per centum, plus costs of containers and coverings of what-ever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, and, accordingly, reversed the judgment of the trial court. In the course of its opinion, the court, after carefully considering the evidence in the case, stated:

On the evidence presented, we believe that the trial court erred in finding that the price paid by "wholesalers" in the foreign market represents the foreign-

market value of this merchandise, as defined by section 402 (c) of the Tariff Act of 1930. We find that the weight of the evidence herein establishes that the greater portion of the total annual business of this manufacturer consists of sales to 1,196 retailers in usual wholesale quantities of less than 1 gross each of the cheap items, and less than one half gross each of the expensive items, at fixed unit prices less discounts of 10 per centum and 2½ per centum; and that sales are made, usually in larger quantities, to 4 preferred customers, 3 of whom are granted larger discounts by reason of their status as "wholesalers", irrespective of the quantities purchased, and the fourth, a chain store, being granted preferential discounts by reason of its unusually large purchases.

With reference to a few items on the invoices for which no unit or basic prices appear in the report of the special agent, the court held:

* * * We note that the unit prices of a few items involved in the cases at bar are not shown in Exhibit 1. As to those items, the unit prices returned by the appraiser, which are presumptively correct under section 501 of the act of 1930, must prevail.

It is contended by counsel for appellants that the Appellate Division of the Customs Court erred in not affirming the judgment of the trial court; in finding and holding that the usual wholesale quantities of the involved merchandise were "less than 1 gross each of the cheap items, and less than one half gross each of the expensive items"; in not finding and holding that the sales in the usual wholesale quantities, and in the ordinary course of trade in the "British Isles", were at trade discounts of 25 per centum and 10 per centum for the cards, and 25 per centum and 2½ per centum for the calendars. Counsel for appellants further contend that the sales to the "retailers" do not constitute sales in the usual wholesale quantities; that, if the sales to the wholesalers do not represent foreign values, the court should have held that the sales of the involved merchandise were restricted to two classes of purchasers—wholesalers and retailers; that the merchandise was not freely offered for sale to all purchasers, within the statutory definition of foreign value; and that, therefore, the evidence was not sufficient to overcome the presumption of correctness attending the appraiser's decisions.

It is contended by counsel for the Government that the burden was upon appellants—the importers—before the trial court to overcome the presumption of correctness attending the local appraiser's appraisements, and, as they failed to overcome that presumption by competent evidence, "their appeal was subject to dismissal, in which event the appraised values should have been affirmed by the trial court"; and that there is substantial evidence of record to sustain the judgment of the Appellate Division of the Customs Court.

Section 402 (c) of the Tariff Act of 1930 reads:

SEC. 402.

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all

purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

It has been held repeatedly by this court that, under the Tariff Act of 1922, no presumption of correctness attended the appraisement of the local appraiser, and that, on an appeal from his decision, the proceeding before the trial court was a trial *de novo*. *Johnson Co.* v. *United States*, 13 Ct. Cust. Appls. 373, T.D. 41318; *United States* v. *Tadross & Co. et al.*, 14 Ct. Cust. Appls. 10, T.D. 41528; *Happel & McAvoy, Inc.* v. *United States*, 16 Ct. Cust. Appls. 161, T.D. 42791; *Meadows, Wye & Co., Inc., et al.* v. *United States*, 17 C.C.P.A. (Customs) 36 T.D. 43324; *United States* v. *T. D. Downing Co.*, 20 C.C.P.A. (Customs) 251, T.D. 46507.

However, section 501 of the Tariff Act of 1930 provides, among other things, that—

The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

Accordingly, we must hold that, in the case at bar, the values found and returned by the local appraiser in each of the cases involved herein were presumed to be correct, and that the burden rested upon the importers, in Reappraisement 100788–A, and upon the Government, in the other six reappraisement cases, on the trial before the associate judge sitting in reappraisement, to overcome the presumption of correctness attending the appraisements of the local appraiser. See *Golding Bros. Co., Inc.* v. *United States*, 21 C.C.P.A. (Customs) —, T.D. 46926.

We are unable to agree with counsel for appellants that the prices paid by the wholesalers, W. Ritchie & Sons, Ltd., W. H. Smith & Sons, Ltd., Dennison Manufacturing Co. of London, England, and the retail firm, Boots Pure Drug Co., operating chain stores, to each of whom the special agent reported preferential treatment was given in the matter of discounts, to the last-named company because of the large volume of annual business transacted by it, and to the wholesalers on account of their status, without regard to the quantities purchased by them, constitute the market value or prices at which such merchandise was freely offered for sale to all purchasers in the country of exportation. There is not only substantial evidence to sustain the holding of the Appellate Division, that those purchasers received preferential treatment in the matter of discounts, but it also clearly appears, as held by the court, that the discounts given to them, and, accordingly, the prices paid by them, were not uniform. In fact, no two of them paid the same prices. Accordingly, as the

prices to each of these purchasers were different for merchandise identical in character, and as the statute, section 402 (c), contemplates but one market value or price for such merchandise, the court was right in holding that the prices paid by those purchasers, including costs of containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, did not constitute foreign values. *United States* v. *M. Minkus*, 21 C.C.P.A. (Customs) 382, T.D. 46912.

It appears from the report of the special agent, Exhibit I, that the 1,196 retailers purchased calendars in wholesale quantities ranging from one half dozen to 3 dozen, each number, and greeting cards in quantities ranging from one half dozen to 1 dozen, each number; and that each received a discount of 10 per centum for settlement in January, and a discount of 2½ per centum if the purchase price was paid within 14 days from the date of invoice.

The witness Ernest Wyman Savory stated in his affidavit, Exhibit II, that the wholesalers, and the retailer operating chain stores, purchased in the usual wholesale quantities, and in the ordinary course of trade, and that such wholesale quantities—

were one gross each or more for the cheap items and one half gross each or more for the expensive items except for a few sales made as an accommodation to these customers, of say a dozen or so of an item, * * * whereas, on the other hand, all of our sales to the retailers have been in less than the usual wholesale quantities hereinbefore stated, and shipments have ranged in value from five shillings upwards.

It is evident, of course, as held by the Appellate Division of the Customs Court, that the quantities sold to the 1,196 retailers were, as stated by both of the witnesses, less than one gross for each item. However, Mr. Savory stated in his affidavit, Exhibit II, that the quantities purchased by the "retailers" were less than the usual wholesale quantities. Accordingly, if the evidence contained in the report of the special agent is to be accepted as establishing the usual wholesale quantities at which the "standard lines" of greeting cards and calendars are freely offered for sale in the ordinary course of trade for consumption in the country of exportation, it should, it seems to us, be held that the usual wholesale quantities for such greeting cards and calendars, each number, ranged, respectively, from one half dozen to one dozen, and from one half dozen to three dozen, rather than, as held by the Appellate Division of the Customs Court, "less than 1 gross each for the cheap items, and less than one half gross each for the expensive items."

It appears from the report of the special agent, Exhibit I, that the greater portion of the manufacturer's business was transacted with the "retailers", and by far the greater number of sales were made to them in the same wholesale quantities, at the same basic prices, less

the same discounts; and that, of the 1,200 customers of the manufacturer, the three wholesalers, and the one retailer operating chain stores, were the only customers who received preferential treatment from, or were favored by, the manufacturer, with regard to discounts.

The statute, section 402 (c), defines foreign value to be the "market value" or the "price * * * at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade * * *", and, obviously, contemplates that the market value or the price of imported merchandise shall be the value or price at which such or similar merchandise is freely offered for sale in the *principal markets* of the country from which exported. Accordingly, evidence of sales by one manufacturer may, or may not, depending upon the circumstances, be sufficient to establish the market value or price in the usual wholesale quantities *and in the ordinary course of trade* in the country of exportation. See *United States* v. *F. Vietor & Achelis*, 16 Ct. Cust. Appls. 122, 124, T.D. 42767; *United States* v. *Malhame & Co.*, 19 C.C.P.A. (Customs) 164, T.D. 45276; *M. J. Corbett & Co., Inc.* v. *United States*, 20 C.C.P.A. (Customs) 178, T.D. 45965.

In the case at bar, both parties proceeded upon the theory that the sales of the manufacturer of the imported merchandise represented the market values or prices at which such or similar merchandise was freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade in the principal markets of the country of exportation. They differed only with respect to the question whether the sales to the wholesalers, and to the retailer operating chain stores, or those to the "retailers", represented such market values. It is true that counsel for appellants contend that the sales were restricted to two classes of purchasers—wholesalers and retailers—and that, therefore, there were no foreign values established. Counsel does not contend, however, that the manufacturer of the imported merchandise did not transact its business in greeting cards and calendars in accordance with the ordinary course of trade in the principal markets of the country of exportation, nor that the sales of the manufacturer, reported by the special agent, were not representative of the sales of other manufacturers in such markets. It is obvious that the sales to the wholesalers, and to the retailer operating chain stores, were restricted, and that merchandise identical with the "standard lines of cards and calendars" here involved was not freely offered for sale to all purchasers at the prices paid by those customers. It is just as obvious, however, that the wholesalers, and the retailer operating chain stores, could have purchased such merchandise from the manufacturer at the prices paid by the "retailers." We are of opinion that, under such circumstances, the evidence of record is

sufficient to establish market values of the "standard lines of cards and calendars" in the country of exportation; and that there is substantial evidence to sustain the findings of the Appellate Division of the Customs Court that merchandise identical with the "standard lines of cards and calendars", here involved, was freely offered for sale to all purchasers in the principal markets of the "British Isles", in the usual wholesale quantities and in the ordinary course of trade, at the prices paid by the "retailers."

It appears from the record, as stated in the decision of the Appellate Division of the Customs Court, "that the unit prices of a few items involved in the case at bar are not shown by Exhibit I." "As to those items", the court held that "the prices in the principal markets of England are the presumptively correct *unit prices* returned by the appraiser, *less discounts* of *10* per centum and *2½* per centum, plus cases". (Italic ours.) So far as that holding applies to the case in which appellants appealed from the decision of the appraiser—Reappraisement 100788-A—we are in entire accord with it. We disagree with it, however, so far as it applies to the other reappraisement cases involved in this appeal—Nos. 100491-A, 100518-A, 100519-A, 100520-A, 100521-A, and 100522-A, in which the collector appealed from the decisions of the appraiser approving the entered values, which values included discounts greater than 10 per centum and 2½ per centum. As to the last-named cases, the holding was evidently based upon the assumption that the statements of the special agent, that the "retailers" received discounts of 10 per centum for settlement in January, and 2½ per centum for settlement within 14 days from the date of the invoice, contained in Exhibit I, had reference to *all* greeting cards and calendars sold by the manufacturer. It appears from that exhibit that the list of basic prices therein set forth was "*a complete list of all series of standard lines of cards and calendars sold both in the home market and to Dennison, together with the manufacturer's home-market price per gross or per dozen.*" (Italics ours.) We are unable to find any reference in Exhibit I to other merchandise, except the "special line of high quality cards" sold, exclusively, to Cartier, Inc., of New York City, nor is there any indication from anything stated therein that the special agent had any information relative to the market value of cards and calendars, other than those included in the manufacturer's "standard lines", the unit or basic prices of which were set forth in the exhibit.

We must hold, therefore, that the evidence contained in Exhibit I was intended by the special agent to be limited to "standard lines of cards and calendars"; that there is no evidence of record as to foreign values of other cards and calendars; and that the presumption of correctness attending the appraiser's appraisement of imported cards and calendars, for which no unit or basic prices were shown in the special

agent's report, has not been overcome, and that, as to such merchandise, the appraiser's findings of values must prevail not only as to the unit or basic prices, but in all other respects as well.

For the reasons herein stated, the judgment is *modified*, being *reversed* so far as it applies to imported merchandise involved in reappraisements 100491–A, 100518–A, 100519–A, 100520–A, 100521–A, and 100522–A, for which no unit or basic prices were shown in the special agent's report, Exhibit I, and in all other respects *affirmed*.

The cause is *remanded* for proceedings consistent with the views herein expressed.